69 So.2d 251

**BARBER** et al. v. **STEPHENSON** et al.

6 Div. 383.

Supreme Court of Alabama.

Oct. 29, 1953.

Rehearing Denied Jan. 14, 1954.

Sadler & Sadler, Birmingham, and Ross, Ross & Ross, Bessemer, for appellants Barber, White Dairy and Barber Pure Milk Co.

Robt. W. Smith, Birmingham, for appellant Wood.

Huey, Welch & Stone and Lipscomb & Brobston, Bessemer, and D. G. Ewing, Birmingham, for appellees.

SIMPSON, Justice.

Plaintiffs Carl and J. P. Stephenson sued George W. Barber, White Dairy Company, a corporation, Barber Milk Company, a corporation, and Leland O. Wood for damages alleged to have resulted from a fraudulent and unlawful conspiracy of defendants to acquire plaintiffs' milk and dairy business, including customers and good will, without any intention of paying for it. Barber was president and the alter ego of the two corporate defendants, owning most of the stock, with members of his family owning the rest, and Wood was plant superintendent of White Dairy before the events averred. Plaintiffs' business was located in Bessemer and was known as Hollywood Dairies and the Barber businesses were in Birmingham.

From a judgment on verdict all defendants have appealed. The rulings of the trial court challenged separately as error are: (1) overruling demurrers to the complaint; (2) refusal of the affirmative charge and other special charges requested by the defendants; and (3) overruling the motion for a new trial. We will discuss these propositions in order.

The case went to the jury on Count 2 of the complaint as last amended, the material allegations of which will be reported with the case. The demurrers pertinent to consider took the point that the complaint failed to state a cause of action. Stripped of its prolixity, its essential allegations charged the defendants with fraudulently conspiring to obtain the plaintiffs' business and the good will of its customers without paying for it and with no intention to pay for it and the execution to full and final accomplishment of that unlawful scheme. Such conduct was actionable and if proven would warrant a verdict for the plaintiffs.

■ A civil conspiracy is a combination between two or more persons to accomplish by concert an unlawful purpose or to accomplish a purpose not in itself unlawful by unlawful means. Bankers Fire & Marine Ins. Co. v. Sloss, 229 Ala. 26, 155 So. 371, and cases cited; National Park Bank v. Louisville & N. R., 199 Ala. 192, 74 So. 69.

Following also is an approved definition: A conspiracy is defined as the combination of two or more persons to do (a) something that is unlawful, oppressive, or immoral; or (b) something that is not unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means; or (c) something that is unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means. 1 Eddy on Combinations, § 171; Horton v. Johnson, 192 Ga. 338, 346, 15 S.E.2d 605; Peoples Loan Co. v. Allen, 199 Ga. 537, 34 S.E.2d 811.

It is clear the complaint was brought within the terms of these definitions and therefore was not subject to the asserted demurrers.

■ Appellants argue that the fraud counted on related not to any false representation of a past or existing fact, but to future occurrences and therefore came within the general rule that such representations are regarded as merely promissory and are not actionable. 37 C.J.S., Fraud, § 11, p. 231; Hawkins v. People's Trust & Sav. Bank, 215 Ala. 598, 111 So. 641; Zuckerman v. Cochran, 229 Ala. 484, 158 So. 324. The general rule is conceded but there are exceptions. One of the exceptions is noted at 51 A.L.R. 63 as follows: "The weight of authority holds that fraud may be predicated on promises made with an intent not to perform the same, or, as the rule is frequently expressed, on promises made without an intention of performance." Many Alabama cases are cited to this text.

Of like import is the statement of the pertinent rule by our late Chief Justice Gardner on the kindred doctrine of rescission in Snell National Bank v. Janney, 219 Ala. 396, 398, 122 So. 362, 363:

"It is well established in this jurisdiction that while a failure to fulfil a mere promise or undertaking—something to be done in the future—alone will not authorize a rescission on the ground of fraud, yet if the promise is made with no intention at the time to perform it, that constitutes fraud justifying a rescission."

Many other Alabama cases have approved the principle. Following are some: Shepherd v. Kendrick, 236 Ala. 289, 181 So. 782, citing 51 A.L.R. 63; Zuckerman v. Cochran, supra; Nelson v. Shelby Mfg. & Imp. Co., 96 Ala. 515, 11 So. 695; Greil Bros. v. McLain, 197 Ala. 136, 72 So. 410; St. Louis & S. F. R. Co. v. McCrory, 2 Ala.App. 531, 56 So. 822; Southern Loan & Trust Co. v. Gissendaner, 4 Ala. App. 523, 58 So. 737.

■ True, as argued for appellants, it is generally held that an action for conspiring with another to induce the latter to break his contract cannot be maintained, the remedy being to sue on it. Erswell v. Ford, 208 Ala. 101, 94 So. 67; Louisiana Oil Corp. v. Green, 230 Ala. 470, 161 So. 479.

■ But that is not this case. The allegations of the complaint set forth a fraudulent conspiracy between all the defendants to acquire plaintiffs' business without paying for it and having no intention to pay for it and by false representations of Wood and other conduct of all defendants conducing to attain that result. Such conduct was actionable. The count goes to show the conspirators were not in the exercise of their just rights, but were guilty of a wrongful act with injury proximately resulting therefrom. The law is that "where there is a conspiracy to act to such wrongful end, *an element of illegality* essential to such scheme to combine and injure renders the enterprise as executed, or sought to be executed, illegal; that the test of what is lawful for an individual to do is not always the true test of what is lawful for a combination of individuals conspiring to a designated end; that there are

things and results lawful for an individual to do or accomplish, which are not lawful for a combination of individuals conspiring and acting to a common end. * * *" Bankers' Fire & Marine Ins. Co. v. Sloss, 229 Ala. 26, 35, 155 So. 371, 378.

We entertain the view, therefore, the count stated a cause of action for civil conspiracy against defendants.

The next question to be considered is whether defendants were entitled to the affirmative charge. Defendant Wood, aside from the issue of the conspiracy, claims to have been entitled to the affirmative charge on another theory which we will discuss later. It is contended for all the defendants that there was no proof that they had entered into any sort of conspiracy prior to October 3, 1947, the onset date of the alleged combination. Concededly there was no positive evidence to that effect, but a conspiracy need not alone be established by that character of evidence. Indeed, seldom is such the case. It is only by looking to the conduct of the alleged conspirators during the progress of the conspiracy and the end result achieved that usually such a fact is established. And to that end it is proper to consider evidence extending over a considerable period, both before and after the date of the alleged combination and even after its termination, just so the proof has a tendency to establish the ultimate fact. Scheele v. Union Loan & Finance Co., 200 Minn. 554, 274 N.W. 673; Blakeney v. State, 31 Ala.App. 154, 13 So.2d 424, certiorari denied, 244 Ala. 262, 13 So.2d 430; 15 C.J.S. Conspiracy, § 92, p. 1143.

In this jurisdiction, unlike in some others, there need be only a scintilla of evidence to require reference of the issue raised thereby to the jury for decision. If there is "a mere 'gleam,' 'glimmer,' 'spark,' 'the least particle,' the 'smallest trace'—'a scintilla'." afforded from the evidence to sustain the issue, the court in duty bound must submit the question to the jury. Ex parte Grimmett, 228 Ala. 1, 2, 152 So. 263. We mention this well-known rule here for emphasis, as it is peculiarly pertinent to our conclusion that the case was properly submitted to the jury.

It would serve no useful purpose to laden the opinion with a detailed recital of the evidence, which is recorded here in some three hundred transcript pages. It is enough to say that from the relationship of the defendants; the fact that Barber wanted to enlarge his business in the Bessemer area; that it was common knowledge Hollywood Dairies was for sale; the negotiation for the sale by Wood, a long-time trusted employee of Barber, who had advanced himself from a day laborer's position when he entered the employ as a boy of seventeen years to the position of plant superintendent, his age at that latter date being thirty-three years; that Wood represented to the plaintiffs that he was not purchasing for Barber or for anyone else, but for himself alone; that when he took over the business it was grossing about $12,000 per month and when he abandoned it it had increased to about $17,000 per month; but meanwhile he had permitted the defendant companies to take over his business, customers, and the customers' good will; all this without notifying the persons most interested, the plaintiffs, and finally abandoning the whole thing and returning to work for Barber. This and other items of evidence in our view would, under the scintilla rule, justify refusal of the affirmative charge on the issue vel non of a civil combination between the defendants to take over for Barber and companies the plaintiffs' business without paying for it.

The following cases bear analogy and are somewhat sustentive: Falstaff Brewing Corp. v. Iowa Fruit & Produce Co., 8 Cir., 112 F.2d 101; Hedrick v. Perry, 10 Cir., 102 F.2d 802; Scheele v. Union Loan & Finance Co., supra; Wm. Goldman Theatres, Inc., v. Loews Inc., 3 Cir., 150 F.2d 738; Globe & Rutgers Fire Ins. Co. v. Firemen's Fund & Ins. Co., 97 Miss. 148, 52 So. 454, 29 L.R.A.,N.S., 869; Peoples Loan Co. v. Allen, supra.

■ The foregoing conclusion also disposes of the contention of defendant Wood that he was entitled to the affirmative charge on his special defense of his release in bankruptcy. The fact of a conspiracy having been a question for the jury to decide on the conflicting evidence made it proper to refuse the affirmative charge on this theory. A discharge in bankruptcy does not release a debtor from liability for fraud such as for obtaining money or property by false pretense or false representation and, of course, the rule would obtain whether or not the fraud was personal to the defendant or was committed by him in concert with others. Gerald v. M. C. Kiser Co., 209 Ala. 532, 96 So. 428; Brown Shoe Co. v. Schaefer, 242 Ala. 310, 6 So.2d 405; 11 U.S.C.A. § 35.

There was likewise no error in refusal of charges 3 and N. Other reasons aside, they were fully covered in the court's oral charge.

■ But the conclusion that the case was properly submitted to the jury on the conflicting evidence by no means leads to the result that the ruling denying the motion for a new trial should be sustained, for this court, after indulging all reasonable intendments in favor of the ruling below, concludes the verdict was unjust. Koonce v. Craft, 234 Ala. 278(5), 174 So. 478; General Accident, Fire & Life Assur. Corp. Ltd., v. Jordan, 230 Ala. 407(7), 161 So. 240.

■ We think the overwhelming weight of the evidence was against the verdict. The reasonable probabilities are against the idea of a conspiracy. At most there was but a scintilla, "a mere gleam," to sustain the rather fanciful charge. If there was a conspiracy, of course defendant Wood was the kingpin and prime actor. A short recital of what happened to him during the fourteen months he tried to operate will strongly impel the conclusion that the preponderance of the evidence was against the verdict. We mention some salient facts: The $10,000 cash payment which Wood made on the purchase price came from $5,000 borrowed from an intimate friend in Georgia and $5,000 through a loan made by his family from a bank in Arkansas; defendant Barber and his general manager testified they knew nothing of Wood's intentions until he notified them the day before he resigned that he was buying Hollywood; he immediately began operations in Bessemer and so operated for fourteen months until his milk producers failed to supply him because of a debt he owed them of some $4,600; being desperate and knowing no other place to turn but to Barber, he arranged with Barber's general manager to furnish him that amount of money to stay in business by paying off these delinquent accounts; this was toward the end of his operations; he thereafter continued to try to operate, selling Barber's milk on a percentage, but this proved to be of no help to him and finally at the end of the fourteen-month period he abandoned the business and bankrupted for about $50,000. While he was superintendent of Barber before his purchase, he was doing very well but he wished to go in business for himself; his wife at that time was employed as a secretary in Birmingham at a salary of $180 per month, but on his purchase of Hollywood she gave up this secretarial position and moved with him and their child to a little two-room dilapidated shack in the back yard of the business, which had not even elementary personal accommodations; she worked as bookkeeper in the office without pay and he only drew about $30 to $40 a week for living expenses; during this period he paid a considerable amount of money on his obligation to the plaintiffs and his obligation to his family in Arkansas and other obligations; this and other established facts tend to show he was doing his best to get along and also tend to negate the idea of a conspiracy. It seems beyond the realm of reasonable probability that Wood would have acted so vicariously to help his one-time employer to his own dire hurt and in the end, after stigmatizing himself as a bankrupt, to be reemployed by one of the corporate defendants as a route man delivering milk to customers. It is argued for

plaintiffs that Barber put up all the money and was the manipulator behind the scenes, but there is no evidence of this nor is such a theory so reasonable. It apparently took only about thirty days at the end of Wood's operations for Barber to take over the customers and the impartial mind cannot lend much credence to the fact that the elaborate plans charged against the defendants with the large outlay of money were, in fact undertaken, when the result could have been accomplished so speedily and with much less expense. As was said by the court, speaking through Justice Sayre, in the case of Twinn Tree Lumber Co. v. Day, 181 Ala. 565, 569, 61 So. 914, 915, on the question of a review of the ruling of the trial court denying a new trial:

> "We are not unmindful of the rules by which this court is governed in the determination of questions of this character. The trial judge, who hears the witnesses, and sees their demeanor on the stand, has a better opportunity than we can have to judge of the weight and credibility of oral testimony, and on appeal great respect is paid to his judgment. But this court has not renounced its duty nor neglected its power to revise the verdicts of juries and the conclusions of trial judges on questions of fact, where, in our opinion, after making all proper allowances and indulging all reasonable intendments in favor of the court below, we reach a clear conclusion that the finding and judgment are wrong. * * * We are clear to that conclusion in this case, and the judgment will be reversed, in order that there may be a new trial, if the parties so desire."

So say we here. Our reluctance to find fault with such rulings of the trial court is traditional. But we are convinced the verdict was contrary to the preponderance of the evidence, resulting that we must order a reversal of the case.

Reversed and remanded.

LIVINGSTON, C. J., and GOODWYN and CLAYTON, JJ., concur.